UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-60318-CR-ZLOCH

UNITED STATES OF AMERICA,

     Plaintiff,

v.

FERNANDO JOSE RAMIREZ-MUNIVE,

     Defendant.

_____/

**DETENTION ORDER**

     Pursuant to 18 U.S.C. § 3142(f), on March 25, 2008, a hearing was held to determine whether Defendant Fernando Jose Ramirez-Munive should be detained prior to trial. Having considered the factors enumerated in 18 U.S.C. § 3142(g), this Court finds that no condition or combination of conditions will reasonably assure the appearance of Defendant as required. Therefore, it is hereby **ORDERED** that Defendant Fernando Jose Ramirez-Munive be detained prior to trial and until the conclusion thereof.

     In accordance with the provisions of 18 U.S.C. § 3142(i), the Court hereby makes the following findings of fact and statement of reasons for the detention:

     1. Defendant is charged by Indictment with conspiracy to distribute at least five kilograms of cocaine, intending that such controlled substance be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a)(1), 960(b)(1)(B), and 963; conspiring to import into the United States from a place outside thereof, at least five kilograms of cocaine, in violation of Title 21, United States Code, Sections 952(a) and 960(b)(1)(B); and conspiring to

possess with intent to distribute at least five kilograms of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(ii), and 846. Based upon these charges, a rebuttable presumption exists that Defendant poses a risk of flight and danger to the community if released. 18 U.S.C. §3142(e) and (f). The Court notes, however, that the United States elected to proceed with its request for detention on the basis of risk of flight, only, not on the basis of danger to the community.

    2. Title 18, United States Code, Section 3142(g)(2), requires the Court to consider the weight of the evidence against the defendant. Here, the weight of the evidence is significant. The government has proffered sworn testimony that supports the allegations in the Indictment. Specifically, the government presented the testimony of Immigration and Customs Enforcement ("ICE") Special Agent Dan Evans. Agent Evans testified that the Colombian National Police ("CNP") began the investigation into the alleged drug-trafficking organization of which Defendant is charged of being a part in March, 2002. In conducting this investigation, the CNP sought and obtained a Colombian wiretap on the residential telephone of Defendant and his alleged co-conspirator brothers, Eric and Roberto Ramirez-Munive, over which conversations involving Defendant and his alleged co-conspirators occurred.

    Among other such intercepted telephone calls, Agent Evans testified that Defendant and Roberto Ramirez-Munive ("Roberto") had several telephone conversations in which drug trafficking was discussed with alleged co-conspirators in New York and Panama. The New York conversations regarded recruiting cruise ship passengers to travel from Miami to Panama and obtain cocaine or heroin and smuggle it back into Miami.

    On August 12, 2002, Colombian law enforcement officers intercepted telephone calls

between Defendant and a crew member of a United States-registered cruise ship. Defendant told the crew member to see an unidentified male to receive 6,000. The government indicated its belief that this referred to $6,000. During another call on the same date, Defendant told the crew member to meet with Eric Ramirez-Munive ("Eric"), an unidentified male, and co-defendant Henry Cantillo-Mendez at the Hotel Washington in Panama to receive the remainder of the papers, a reference to money, in the government's opinion. The crew member told Defendant that he could not carry "that," meaning drugs, according to the government, because it was very risky since the crew member would have to leave the ship. During this conversation, Defendant said that Cantillo sent "it," meaning drugs, the same way that the crew member had received it on other occasions. The crew member then asked Defendant how he would be able to disembark with "it," again a reference to drugs, the agent testified. Defendant asked the crew member whether the crew member had any friends who could help, and the crew member responded that two had already left and another he asked did not want to do it. The crew member then asked how much he would have to carry, and Defendant replied that it would not be much, just a jacket or a girdle. When the crew member asked Defendant how much the girdle would contain, Defendant replied, "Like 10," meaning 10 kilograms of cocaine, according to the government. The crew member expressed his displeasure about the bulk of the girdle, complaining about the risk involved. Eventually, however, the crew member agreed to carry the drug-laden girdle.

On August 17, 2002, co-defendant Roberto called the Hotel Washington and asked for Defendant and Eric. Eric answered the telephone, and Roberto asked Eric if they paid the crew member's "salary." Eric indicated that he believed that the crew member was paid 6,000 pesos.

A few days later, on August 23, 2002, Julio Pinda, a crew member on a cruise ship, was

arrested at Port Everglades with a girdle containing approximately eight kilograms of cocaine, when he attempted to disembark. That same date, the CNP intercepted Defendant speaking on the telephone to an unidentified co-conspirator. According to the government, Defendant stated that he was worried because he was not able to contact the crew member. Defendant further indicated that he was calling because alleged co-conspirator Andres Contreras-Porto came by "acting like a crazy person." Defendant explained that one of the guys at the beach, meaning in South Florida, according to the government, had binoculars and saw the guy being taken away in handcuffs. The agent testified that the government interpreted this as a reference to the arrest of Pinda. The alleged co-conspirator then asked Defendant whether the crew member had been carrying for Contreras-Porto, to which Defendant responded that he had. When the alleged co-conspirator asked Defendant how much the crew member was carrying, Defendant replied, "seven." The alleged co-conspirator then asked Defendant whether it was the "expensive stuff," a reference to heroin, according to the government. Defendant responded that it was not. Instead, it was "puro perez," meaning cocaine, Agent Evans explained. The co-conspirator then asked Defendant to talk to Contreras to see whether the crew member had been arrested, and, if so, to throw away all of the telephones.

Based on the investigation, the government views co-defendants Contreras-Porto and Cantillo-Mendez as suppliers of narcotics. The government further asserted that Defendant and his brothers' roles included recruiting crew members working onboard cruise ships traveling to and from South Florida from ports in Central and South America, to carry the narcotics into the United States.

Pursuant to Title 18, United States Code, Section 2518(b)(9), Defendant contests the Court's ability to consider in making its pretrial detention determination any evidence offered by the United States, which was gathered as a result of the Colombian wiretap. Section 2518(b)(9) provides, in

4

relevant part,

> The contents of any wire, oral, or electronic communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved.
> . . .

In this case, Defendant received no copy of any court order and accompanying application under which the telephone calls were intercepted by the Colombian government. Defendant further suggests that the Colombian government may have conducted the wiretap as a joint venture with United States law enforcement or pursuant to a request of the United States. Thus, Defendant argues that the Court cannot rely upon any evidence deriving from the Colombian wiretap.

The undersigned respectfully disagrees with Defendant's conclusion. Agent Evans testified that the CNP advised him that the CNP had obtained the wiretap at issue on its own, without United States involvement or request, and that it had done so through the Colombian government channels. Although the DEA had an advisory and supportive role in the investigation of Defendant and his alleged co-conspirators, Agent Evans testified clearly that Colombia undertook the wiretap entirely on its own. Moreover, Agent Evans further stated that ICE became involved in the investigation only in January, 2003, which was after the CNP had already obtained the wiretap at issue in this case and had intercepted the conversations described above. Defendant presented no evidence contradicting Agent Evans's testimony that the wiretap was entirely CNP-initiated and run. Under these circumstances and for purposes of the detention hearing, the undersigned finds that the wiretap at issue did not result from a joint venture and was not performed at the behest of the United States

of America.  By the express terms of Title 18, United States Code, Section 2518(b)(9), the notice requirements pertain solely to wire interceptions conducted pursuant to Chapter 119 of Title 18.  The protections of the Section do not extend to conversations recorded as a result of the Colombian wiretap relied upon by the United States at the detention hearing.  As a result, the Court considers these conversations as recounted by the United States in reaching its conclusion that significant evidence of the indicted charges exists against Defendant.

    3. The pertinent history and characteristics of Defendant, of which Sections 3142(g)(3)(A) and (B) require a review, include the following: although Defendant has no prior convictions in the United States, he was convicted in Colombia on drug-related charges.  Upon Defendant's completion of his Colombian jail term, Colombia extradited Defendant to the United States to face the charges at issue in the pending Indictment.

    Defendant is a citizen and lifelong resident of Colombia. With the exception of one sibling who lives in Italy, Defendant's relatives, including his wife, twin brother, sister-in-law, nieces, and parents, reside in Colombia.  Nor does Defendant have any known ties to the United States. Defendant is currently in the United States only because he was extradited by the Colombian government to face the charges in this case.  Under these circumstances, and particularly in view of the fact that if convicted, Defendant faces a minimum mandatory term of ten years' imprisonment, with a maximum of life, the Court finds that Defendant's pertinent history and characteristics provide a strong indication that Defendant presents a serious risk of flight.

    4.  Based on the nature of the charges, the weight of the evidence against Defendant, the sentence Defendant faces if convicted, Defendant's lack of ties to the United States, and the fact that he is here only because the Colombian government extradited him to face the charges in the

Indictment, the Court is not able to find that Defendant has rebutted the presumption that he constitutes a serious risk of flight. *See* 18 U.S.C. §3142(g). Moreover, even not considering the presumption, the Court finds, by a preponderance of the evidence that Defendant constitutes a serious risk of flight. Therefore, the Court specifically finds that there are no conditions or combination of conditions which reasonably will assure Defendant's appearance as required. 18 U.S.C. § 3142(e).

    5. Accordingly, the Court hereby directs:

    (a) That Defendant be detained without bond and be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practical, from persons awaiting or serving sentences or being held in custody pending appeal;

    (b) That Defendant be afforded reasonable opportunity for private consultation with counsel; and

    (c) That, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which Defendant is confined deliver Defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

    **DONE AND ORDERED** at Fort Lauderdale, Florida, this 25th day of March, 2008.

    _____
    ROBIN S. ROSENBAUM
    United States Magistrate Judge

Copies to:
Robert W. Stickney, Esq.
Don Chase, AUSA
Pretrial Services (FTL)